IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 26, 2011 Session

# IN RE ZEYLON T.S.

**Appeal from the Knox County Juvenile Court**
**No. 46816    Timothy E. Irwin, Juvenile Court Judge**

**No. E2011-00287-COA-R3-PT-FILED-OCTOBER 24, 2011**

This appeal concerns the termination of parental rights. The mother is appealing the juvenile court's judgment terminating her parental rights. The child at issue was initially taken from his mother's custody by the Tennessee Department of Children's Services after his school reported excessive tardiness and absences. The juvenile court determined that the child was homeless, and that the mother would not provide for his needs. The child was placed with a relative. Lengthy proceedings ensued. The Department filed a petition to terminate the mother's rights, which was eventually tried by the juvenile court. The juvenile court terminated the mother's parental rights, and the mother now appeals, arguing that the State failed to prove by clear and convincing evidence any statutory grounds for termination, failed to prove that it made reasonable efforts to reunify, and failed to prove that the termination of her parental rights was in the best interest of the child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Reversed in Part and Affirmed in Part**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Andrew J. Crawford, Esq., Knoxville, TN for the Appellant, D.A.S.

Robert E. Cooper, Jr., Attorney General and Reporter, Joshua Davis Baker, Assistant Attorney General, for the Appellee, Tennessee Department of Children's Services.

## OPINION

### FACTS AND PROCEEDINGS BELOW

This is the second appeal in this matter. *See In re Z.T.S.*, No. E2007-00949-COA-R3-PT, 2008 WL 371184 (Tenn. Ct. App. Feb. 12, 2008). The child at issue in this case, Zeylon T.S. ("Zeylon"), was born to Respondent/Appellant D.A.S. ("Mother") on May 1, 1996, in Orange County, California. Mother and the unknown biological father were never married to one another. At some point, Mother and Zeylon moved to Knoxville, Tennessee, where Zeylon attended school.

In 2004, when Zeylon was approximately seven years old, his excessive tardiness and unexcused absences were reported by his school to Petitioner/Appellee Tennessee Department of Children's Services ("DCS"). Thereafter, a guardian ad litem ("GAL") for Zeylon was apparently appointed.[1] On March 8, 2004, the GAL filed a petition in the Juvenile Court of Knox County, Tennessee, for the emergency removal of Zeylon from Mother's custody. The petition asserted that Mother was homeless, that Zeylon arrived to school each morning hungry but too late for the school breakfast, and that Mother insisted that school personnel administer Zeylon's asthma medications differently than ordered by his physician. The petition expressed concern that Zeylon had administered his medication to himself without adequate supervision, and asserted that this could have led to serious health problems or death.

Subsequently, the Juvenile Court appointed an attorney to represent Mother in the dependency and neglect proceedings. On March 15, 2004, after a hearing, the Juvenile Court determined that Zeylon was dependent and neglected and awarded temporary custody to DCS. Mother was present at the hearing, with her appointed attorney.

On May 17, 2004, the Juvenile Court held a hearing at which Mother was represented by counsel but did not appear. The order on this hearing found that the child was dependent and neglected due to Mother's lack of suitable housing, instability, and failure to meet the child's educational and medical needs. The order provided for supervised visitation for Mother and approved a permanency plan that had been provided to Mother. Under the permanency plan, Mother was required to: 1) obtain and maintain stable and adequate housing as well as a legal source of income; 2) follow all court orders, maintain regular contact with DCS and inform her case manager of any changes in circumstances including address, employment, or telephone number; 3) have a mental health assessment and follow all recommendations,

---

[1]The appellate record does not include an order appointing the GAL, but includes pleadings filed by the GAL in this matter.

including if applicable a full psychological evaluation, individual therapy, and a medical evaluation; 4) refrain from using illegal drugs or abusing alcohol and follow all recommendations from her alcohol and drug assessment; 5) cooperate with all service providers, including school personnel, medical providers, and the social security office.[2] In July 2004, a new attorney was appointed to represent Mother.

On March 11, 2005, the Juvenile Court entered an order approving the physical transfer of Zeylon to his aunt in Texas. DCS retained legal custody.

In the three years after Zeylon was taken into protective custody, the record contains no indication that Mother made any progress toward completing her responsibilities in the permanency plan. The record indicates that she would not cooperate or work with DCS employees to facilitate visitation or complete the plan requirements.[3] The record also indicates that Mother moved several times[4] without providing a consistent address to DCS case managers. During this time period, yet another attorney made an appearance on Mother's behalf.

On September 20, 2006, DCS filed a petition to terminate Mother's parental rights. At that time, Zeylon had been residing in Texas with his foster mother for eighteen months. After Mother's attorney was permitted to withdraw based on the attorney's inability to communicate with Mother, the Juvenile Court appointed yet another attorney to represent Mother in the termination proceedings. A hearing was held on April 17, 2007 before the Juvenile Court. On May 8, 2007, the Juvenile Court entered an order terminating Mother's parental rights.

After the Juvenile Court's decision, Mother filed her first appeal. On February 12, 2008, the appellate court entered an order vacating the decision of the Juvenile Court based on lack of subject matter jurisdiction under the UCCJEA, Tenn. Code Ann. § 36-6-201, *et seq*. The appellate court found that Texas had become Zeylon's home state and that no parent

---

[2]The initial permanency plan was updated on August 1, 2005 and on August 31, 2006, and the Juvenile Court ratified these in permanency hearings held on December 7, 2005 and November 15, 2006. The five requirements of Mother in the initial permanency plan were consistently included in every permanency plan throughout the termination proceedings.

[3]Mother sometimes alleged that she had completed all the requirements of the permanency plan, but provided DCS no proof to substantiate those claims.

[4]At one point, Mother filed a *pro se* petition asking that the case be transferred to Memphis, Tennessee. However, at the hearing on her petition, Mother did not appear and her lawyer informed the Court that Mother had moved to an unidentified location in Texas.

remained in the State of Tennessee. The appellate court remanded the case to the Juvenile Court with instructions to vacate its decision.

On remand, the Juvenile Court communicated with the appropriate court in the State of Texas, and in November 2008, the Texas court issued an order declining to exercise jurisdiction. This corrected the jurisdictional issues and the Juvenile Court of Knox County thereafter assumed jurisdiction under the UCCJEA based on Tennessee's significant connection to the child. The Juvenile Court appointed still another attorney to represent Mother going forward.

On January 29, 2009, the Juvenile Court held an evidentiary hearing. Mother received a notice but did not appear at the hearing; her attorney was present. The record does not include a transcript of the hearing. After the hearing, the Juvenile Court entered two orders. The first approved a new permanency plan for Zeylon, with the same responsibilities for Mother. The second was a no-contact order, enjoining Mother from contacting Zeylon through telephone calls, written or electronic messages, or messages through third parties. Mother was permitted only to send Zeylon letters and packages through the mail, to be screened by Zeylon's foster parents. The injunction and the continued finding that Zeylon was dependent and neglected was based on the Juvenile Court's factual findings:

> . . . [T]he court finds today that the child is dependent and neglected within the meaning of the law due to the mother's very inconsistent visitation; frequently not showing up for visitation that was planned for her convenience, at dates and times that she felt that she could attend; missing many more visits than she attended; not seeing the child at all between March or April of 2006 and September 4, 2006; showing up at a time and place that she was not expected, on September 15, 2006, at the child's football game and creating a disturbance, after which the child was visibly upset and was eventually escorted from the area. The mother had made threats to kill the child if he didn't come home. The child is fearful of his mother and does not want to have any contact with her. The mother has made virtually no documented progress on any of her permanency plans. . . .

Mother was enjoined from going near Zeylon's foster home, school, or extracurricular activities.

On January 13, 2010, the Juvenile Court held an evidentiary hearing on Zeylon's continued foster placement, Mother's progress on her responsibilities under the permanency plan, and to approve a new permanency plan. Mother did not appear at the hearing but was represented by counsel. The record does not include a transcript of the hearing. Two days after the

-4-

hearing, the Juvenile Court entered an order finding, in pertinent part, that Mother had had no contact with DCS and avoided service of process by DCS, that Mother had made no progress on any of her responsibilities under the permanency plan and in fact had told DCS employees in 2008 or 2009 that she was not obliged to complete the responsibilities assigned to her in Zeylon's permanency plan, and finding that DCS had made reasonable efforts with regard to Mother.

Several things happened in September 2010. First, DCS filed the petition to terminate Mother's parental rights that is the subject of this appeal. In the petition, DCS sought to terminate Mother's parental rights on the grounds that she abandoned her child by failing to provide a suitable home, persistent conditions, mental incompetence, and failure to substantially comply with the permanency plan.[5]

Also in September 2010, in connection with the filing of the termination petition, DCS filed an affidavit outlining its unsuccessful efforts to locate and serve Mother. The affidavit stated that Mother was engaged in appealing the no-contact order and DCS was in contact with her attorney and various of Mother's relatives, but Mother had supplied DCS with only inaccurate addresses and telephone numbers, and her attorney reported to DCS that he had been instructed not to disclose her address and telephone number. Perhaps not surprisingly, Mother's attorney filed a motion to withdraw from representing Mother. The Juvenile Court held a hearing on the attorney's motion to withdraw, and on DCS's request to serve Mother by publication. However, Mother appeared at the hearing and so was personally served. At the hearing, the Juvenile Court explained to Mother that if her attorney were permitted to withdraw, she would not be entitled to the appointment of another attorney and would have to proceed *pro se*. Mother agreed to allow her attorney to withdraw.[6] Mother was notified

---

[5]Although the allegations in DCS's termination petition appear to parrot provisions in the statutes governing termination proceedings, inexplicably the petition cites *none* of the statutory provisions on the grounds for such termination. We surmise that the applicable statutory provisions are Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii) (abandonment by failure to provide suitable home); § 36-1l-113(g)(2) (substantial noncompliance with permanency plan); § 36-1-113(g)(3) (persistent conditions); and § 36-1-113(g)(8) (mental incompetence).

[6]In its order, the Juvenile Court recited the names of at least six attorneys who had represented Mother in the dependency and neglect proceedings or the termination proceedings, most of whom withdrew based on difficulties in communicating with Mother. While parents whose parental rights are at issue are routinely appointed counsel, in Tennessee, "a [parent] in a termination of parental rights case has no absolute right to be represented by counsel." *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 Tenn. App. LEXIS 808, at *15; 2010 WL 5549229, at *6 (Tenn. Ct. App. Dec. 29, 2010); *Tenn. Dep't of Children's Servs. v. Agbigor*, M2000-03214-COA-R3-JV, 2002 Tenn. App. LEXIS 807, at *15-16; 2002 WL 31528509 at *5 (Tenn. Ct. App. Nov. 15, 2002) (*perm. app. denied*) (relying on *Lassiter v. Dep't of Social Servs.*, 452 U.S.
(continued...)

of the date of the hearing on the termination petition, and she provided the Juvenile Court with a Fairfax, Virginia address for future correspondence.

The Juvenile Court held the hearing on the petition to terminate Mother's parental rights on January 6, 2011, as scheduled. Mother did not appear at the hearing. The Juvenile Court heard testimony by Christine Ray ("Ray"), the DCS case worker assigned to the case.

Ray testified that she had been assigned to the case since July 2006. Despite having been on the case for over four years, Ray had never met Mother. Ray had spoken to Mother on the telephone "maybe five times." Despite Mother's frequent moves, Mother gave Ray a correct telephone number to reach her on only one occasion; on every other occasion, the telephone number Mother supplied to Ray turned out to be incorrect. Ray's last contact with Mother was in 2008. The only address Mother gave Ray for a home study was a motel, which was unsuitable for home study. Mother told Ray that she was receiving Social Security SSI benefits based on a diagnosis of "bipolar," but provided no verification of either the diagnosis or her receipt of SSI benefits.

In her testimony, Ray described her infrequent conversations with Mother. Overall, she said Mother was uncooperative and did not want to talk to her. Ray said that Mother had taken no responsibility for the conditions that led to Zeylon being taken into protective custody, but instead blamed various other people, such as school officials or neighbors. Ray said that the infrequent visitation Mother had had with Zeylon did not go well. Mother would not follow the rules, argued with social services workers, was overly emotional and erratic, and either scared the child or paid no attention to gifts he gave her.

With respect to the permanency plan, Ray testified that Mother was aware of her assigned responsibilities and had been given, in person, a copy of the permanency plan. When Ray

---

[6](...continued)
18, 101 S. Ct. 2153 (1981)); *In re K.D.D.*, No. M2000-01554-COA-R3-JV, 2001 Tenn. App. LEXIS 141, at *7; 2001 WL 219669, at *3 (Tenn. Ct. App. Mar. 7, 2001)). A parent's due process rights in a parental termination case are not violated when a court finds that the parent has effectively waived his or her right to appointed counsel through the parent's own conduct. *See In re Elijah B.,* 2010 Tenn. App. LEXIS 808, at *16-17; 2010 WL 5549229, at *6 (finding that a father that failed to respond to his attorney, attend the termination proceeding, or assist attorney in preparation of his case, effectively waived his right to appointed counsel); *Agbigor*, 2002 Tenn. App. LEXIS 807, at *1-2; 2002 WL 31528509, at *6 (holding that a parent effectively waived his right to appointed counsel by refusing to cooperate with his attorney, as it was the only reason he had no attorney at the final termination hearing); *In re K.D.D.*, 2001 Tenn. App. LEXIS 141, at *11; 2001 WL 219669, at *3 (holding that a parent waived her right to appointed counsel despite the fact that she did not sign a written waiver). Mother's waiver of her right to appointed counsel is not raised as an issue in this appeal.

talked to Mother about her responsibilities under the plan, Mother would tell Ray on some occasions that she had completed what was required of her but was never able to provide any verification or documentation. Other times, Mother told Ray she did not have to perform any of the permanency plan requirements because "[y]ou people are doing everything illegally" and threatened to sue. Ray also outlined the circumstances leading to the no-contact order, including a disturbing remark made by Mother to the foster mother in which Mother stated in reference to Zeylon: "If I can't have him, nobody's going to have him and I'll kill him." Ray testified that the requirements in the permanency plan had remained substantially unchanged since March 2004. Despite this, Ray said, Mother had been almost entirely uncooperative with DCS and had not completed any of her essential responsibilities in the permanency plan. At one point during the hearing, the Juvenile Court judge questioned Ray about the grounds for termination alleged in the DCS petition:

> THE COURT: . . . Ms. Ray, do you have any evidence or any communications that would indicate that this mother has completed any of the provisions in the permanency plan?
>
> THE WITNESS: No.
>
> THE COURT: Do you have any information that would indicate that the mother has secured suitable housing?
>
> THE WITNESS: No.
>
> THE COURT: Do you have any information that would indicate that the mother has addressed her mental health concerns?
>
> THE WITNESS: No.
>
> THE COURT: Do you have any indication that the mother is more fit to parent this child today than she was at the time of the child's removal?
>
> THE WITNESS: No.

On best interest, Ray described Zeylon's experience living with his foster mother as very happy and healthy, and said that he was flourishing. She stated that the child prefers to use his foster mother's last name, that his asthma and other medical problems have significantly improved in the foster mother's care, that the child does not want any contact with Mother nor does he wish to be returned to Mother's custody. Ray testified that the foster mother wanted her home to be Zeylon's permanent home.

Based on the above testimony, DCS requested termination of Mother's parental rights. Zeylon's court-appointed GAL recommended termination as well.

At the conclusion of the hearing, the Juvenile Court issued an oral ruling finding that all of the grounds for termination alleged in DCS's termination petition had been proven by clear and convincing evidence. It also found by clear and convincing evidence that DCS made "extraordinary efforts" to reunify Mother with Zeylon, and that termination of Mother's parental rights was in the child's best interest.

On January 25, 2011, the Juvenile Court entered a lengthy, but somewhat duplicative and confusing, order terminating Mother's parental rights. In the order, the Juvenile Court first "adopts all of its findings from the April 17, 2007 hearing, as they applied to the case at the time of that hearing," and then apparently copied the findings at that time.[7] The order than goes on to address the January 6, 2011 hearing. It recounted the evidence presented, the history of the case from the file, and the basis for the no-contact order. The Juvenile Court issued findings to support grounds for termination of Mother's parental rights. Inexplicably, the order recites none of the statutory provisions on the grounds for termination. We surmise that the grounds apparently found by the Juvenile Court are abandonment by failure to provide a suitable home, under Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); substantial noncompliance with the permanency plan under Section 36-1-113(g)(2); persistent conditions under Section 36-1-113(g)(3); and mental incompetence under Section 36-1-113(g)(8). The Juvenile Court found that DCS had made reasonable efforts to assist Mother, and observed: "The Department cannot force the mother to comply and it is apparent from her lack of cooperation that she does not intend to comply." It found clear and convincing evidence that termination was in Zeylon's best interest, and so terminated Mother's parental rights. From this order, Mother now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother challenges the Juvenile Court's termination of her parental rights. She argues that DCS failed to prove by clear and convincing evidence any of the statutory grounds for termination, failed to show by clear and convincing evidence that it made reasonable efforts to reunify the child with Mother, and failed to show by clear and convincing evidence that the termination of Mother's parental rights was in the best interest of the child.

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal

---

[7]The reason for this is not readily apparent from the record.

-8-

and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65-66, 120 S. Ct. 2054 (2000); ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993); ***In re Giorgianna H.***, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. ***In re Giorgianna H.***, 205 S.W.3d at 215. It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. ***Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002); ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1) (2010). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); ***In re Adoption of A.M.H.***, 215 S.W.3d at 809; ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

This heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. ***See In re M.W.A., Jr.***, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence that meets the clear and convincing standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re Audrey S***., 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted). "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id.*** (citations omitted); ***see also In re A.D.A.***, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002).

In light of the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." ***In re Tiffany B.***, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to the credibility of the witnesses. ***Seals v. England/Corsair Upholstery Mfg. Co.***, 984 S.W.2d 912, 915 (Tenn. 1999). Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to determine whether they are supported by the preponderance of the evidence; these facts are presumed to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). We then determine whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish all of the

elements required to terminate the biological parent's parental rights. ***In re Tiffany B***., 228 S.W.3d at 156; ***In re S.M.***, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law, including its conclusion that the State presented clear and convincing evidence to support termination, are reviewed *de novo* on the record, affording them no presumption of correctness. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn. 1993)***; In re Tiffany B***., 228 S.W.3d at 156.

## ANALYSIS

### Grounds for Termination

On appeal, Mother first argues that the State has not met its burden of establishing by clear and convincing evidence that statutory grounds for termination exist. We address each ground in turn, and then consider reasonable efforts as an element of the State's proof of grounds for termination.

### *Mental Incompetence*

The Juvenile Court found that DCS had established by clear and convincing evidence that Mother's parental rights should be terminated based on her mental incompetence to parent Zeylon.[8] Mother argues that this ground was not established because "DCS did not provide

---

[8]The relevant portion of Tenn. Code Ann. § 36-1-113(g)(8) states,

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> > (8) (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
> >
> > > (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
> > >
> > > (ii) That termination of parental or guardian rights is in the

(continued...)

any expert testimony or any specific lay testimony that [Mother] suffers from a mental health condition to such a degree that would render her unable to parent the child." The State did not address this ground in its appellate brief.

We agree with Mother. The evidence established at most that Mother appeared erratic and unstable, and DCS case worker Ray alluded to Mother telling her that she had been diagnosed as "bipolar." This falls far short of establishing by clear and convincing evidence the statutory ground of mental incompetence. The holding of the Juvenile Court as to this ground for termination must be reversed.

### *Abandonment by Failure to Provide Suitable Home*

The parental rights of a biological parent may be terminated if the parent is deemed to have abandoned the child. Tenn. Code Ann. § 36-1-113(g)(1). Such abandonment within the meaning of the termination statutes can take several forms. Tenn. Code Ann. § 36-1-102(1)(A)(i-v). The type of abandonment at issue in this appeal is abandonment by failure to provide a suitable home, defined as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
> * * *
> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child,

[8](...continued)
> best interest of the child; . . . .

Tenn. Code Ann. § 36-1-113 (g)(8)(B)(i) and (ii).

but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . .

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2010). The Juvenile Court found that this ground had been established by clear and convincing evidence.

On this ground, Mother argues that the only evidence submitted regarding the early history of the case is from Ray's identification of the documents in Zeylon's case file, and no testimony was submitted on this ground. DCS does not dispute this, but argues that the documents in the case file, such as interim orders, DCS reasonable efforts affidavits, and order ratifying permanency plans, show that Mother failed to provide a suitable home for Zeylon.

We agree with Mother's argument as to this ground for termination. Simply identifying and submitting the child's case file does not substitute for evidence on this ground. The only other evidence submitted was Ray's testimony that Mother moved often and would not provide an address, and her negative response to the Juvenile Court Judge's question on whether she had "any information that would indicate that the mother has secured suitable housing." This is not sufficient to carry the State's burden to prove this ground by clear and convincing evidence.

We note that the Juvenile Court's order "adopts" the Juvenile Court's findings from the April 17, 2007 hearing, prior to the first appeal, and that these findings discuss in detail the early proceedings, including Mother's home. However, the Juvenile Court's decision in April 2007 hearing was vacated on appeal for lack of jurisdiction. On appeal, the State has provided no authority on how an earlier, vacated ruling can be "adopted" in proceedings on remand, or the significance of such an action if in fact it can be done. We must respectfully decline to rely on the findings in the vacated April 7, 2007 hearing to supply clear and convincing evidence to establish willful abandonment by failure to provide a suitable home. Therefore, the Juvenile Court's finding on this ground must be reversed.

The Juvenile Court also found that DCS had established by clear and convincing evidence the ground for termination commonly referred to as "persistent conditions," set forth by statute:

> **(g)** Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> **(3)** The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> **(A)** The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> **(B)** There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> **(C)** The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A-C) (2010). Mother argues simply that DCS did not proffer sufficient evidence to establish this ground by clear and convincing evidence.

In response, DCS notes that Zeylon was removed from Mother's care because she did not provide a stable home for him, did not feed him properly, and failed to appropriately administer his medicine. DCS argues on appeal that the proof at the hearing showed that Mother was in no better circumstance, stating that it showed that she

> [H]as not established a permanent home and there was no proof presented, mainly because [Mother] chose not to attend the termination hearing, that she had a steady job, income, or had addressed her mental health issues. . . . Nothing in the record showed that [Mother's] condition or lifestyle had

improved to the point where she could adequately care for Zeylon or would be able to in the near future.

The State's argument points to the most troubling part of this case, namely, that Mother's utter refusal to engage or cooperate with DCS or participate in the proceedings leaves the record devoid of proof as to Mother's condition, her home, her income, her mental health, or anything else. Of course, the State has the affirmative burden of establishing this ground by clear and convincing evidence. We are concerned that reversing on this ground would be in essence rewarding Mother's bad behavior, namely, her refusal to cooperate or participate. The State, however, has provided no authority indicating that a lack of evidence on this ground is sufficient to carry the State's burden. Therefore, we reluctantly reverse the Juvenile Court's finding on this ground.

### *Noncompliance with Permanency Plan*

Tennessee requires the development of a plan of care for every foster child setting forth both the parental and agency responsibilities that are reasonably related to the plan's goals. Tenn. Code Ann. § 37-2-403(a)(2)(A) (2010). A ground for termination exists when DCS proves by clear and convincing evidence that there has been substantial non-compliance with the statement of the parent's responsibilities set forth in the plan of care or permanency plan. Tenn. Code Ann. § 36-1-113(g)(2) (2010). Substantial noncompliance is a question of law which we review *de novo* with no presumption of correctness. ***In re Valentine***, 79 S.W.3d at 548.

Mother does not argue on appeal that the responsibilities assigned to her in the permanency plan were not reasonable or were not related to remedying the conditions which necessitate foster care for Zeylon[9]. Tenn. Code Ann. § 37-2-403(a)(2)(C) (2010). Mother does not dispute that she had knowledge of the responsibilities assigned to her in the permanency plan, or that she was notified that failure to substantially comply with those responsibilities could result in the termination of her parental rights.[10] She argues only the DCS did not establish this ground by clear and convincing evidence. We disagree. The testimony provided by DCS shows clearly and convincingly that Mother clearly did not comply, substantially or otherwise, with the requirements in the permanency plan. The record clearly shows that DCS provided Mother with at least one copy of the permanency plan and many others were mailed

---

[9]We find that the responsibilities assigned to Mother in the permanency plan were reasonable and related to remedying the conditions that required DCS to take the child into protective custody.

[10]We find that the record establishes that Mother knew the responsibilities assigned to her and that failure to complete her responsibilities could result in the termination of her parental rights.

to her without being returned. Mother indicated familiarity with the plan's requirements in her few telephone conversations with DCS case worker Ray. Mother's utter failure to comply is perhaps best evidenced by her assertion to Ray that she did not need to comply with the plan's requirements. Because Mother declined to even appear at the hearing on the termination petition, DCS's testimony on this ground was unrebutted. Therefore, we hold that the Juvenile Court properly found by clear and convincing evidence that Mother did not substantially comply with the reasonable requirements set forth in the permanency plan. As noted above, only one statutory ground for termination need be established. *In re Valentine*, 79 S.W.3d at 546; *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000).

### *Reasonable Efforts by DCS*

Under the parental termination statutes, DCS has the explicit responsibility to make reasonable efforts to reunify children and their parents after the children are removed from their parents' home. *In re Tiffany B.*, 228 S.W.3d 148, 158 (Tenn. Ct. App. 2007), citing Tenn. Code Ann. § 37-1-166). Reasonable efforts must be shown as an element of the State's proof on grounds for termination. Tenn. Code Ann. § 36-1-113(m) (2010). The term "reasonable efforts" has been defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1)(2010). The reasonableness of DCS's efforts depends upon the circumstances of a particular case. *In re Tiffany B.*, 228 S.W.3d at 158. DCS employees must use their superior insight and training to assist parents with the problems that DCS has identified in the permanency plan, whether parents ask for help or not. *State of Tenn. Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008).

Nevertheless, we have recognized that the reunification of a family is a two-way street and that neither law nor policy requires DSC to accomplish reunification on its own without the assistance of the parents. *In re Tiffany B.*, 228 S.W.3d at 159. Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody and they also must make reasonable efforts to rehabilitate themselves once DCS has made services available to them. *Id.* at 159.

In the instant case, the Juvenile Court found that DCS made reasonable efforts both initially to prevent removal by attempting to assist Mother "in obtaining housing, employment, medical and educational assistance with her son" and in DCS's efforts to reunify Mother with Zeylon. The Juvenile Court observed that DCS could not force Mother to complete her responsibilities under the permanency plan and that Mother's complete failure to cooperate made it clear that she would not comply.

Mother attempts to analogize her situation with that presented in ***In re Tiffany B.***, in which the Court found that DCS had not demonstrated reasonable efforts. ***In re Tiffany B.***, 228 S.W.3d at 160. We disagree. In this case, the record shows that DCS made diligent efforts to locate Mother, through her relatives, her various attorneys, and other sources. Mother simply chose not to be found. DCS cannot be expected to work miracles in the face of such dogged resistance to being assisted. We agree with the finding of the Juvenile Court. Therefore, we find that grounds for the termination of Mother's parental rights were established by clear and convincing evidence.

### Best Interest

In addition to grounds for termination, a court considering a petition to terminate parental rights must determine by clear and convincing evidence that termination of the parental rights of the biological parent is in a child's best interest. Tenn. Code Ann. § 36-1-113(c)(2011). Tennessee Code Annotated, section 36-1-113(i) sets forth a non-exhaustive list of factors to be used in determining whether termination is in the child's best interest:

**(1)** Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

**(2)** Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

**(3)** Whether the parent or guardian has maintained regular visitation or other contact with the child;

**(4)** Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

**(5)** The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

**(6)** Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

**(7)** Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether

there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

**(8)** Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

**(9)** Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to Tenn. Code Ann. § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1-9) (2010). The trial court is not required to find that each enumerated factor favors termination before it may conclude that termination of parental rights is in the best interest of the child. ***In re M.A.R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

Mother argues on appeal that the evidence shows that the child lived with her for eight years and that they had a close bond. She contends that DCS failed to show best interest by clear and convincing evidence.

In this case, the evidence shows that, whatever bond the child once had with Mother, that bond is now irretrievably broken. This was not caused by DCS, but by Mother's own conduct. The evidence indicates that she has made no adjustment in her circumstance, conduct, or conditions to make it safe or in Zeylon's best interest to be returned to her. Mother is in no better shape to parent Zeylon than she was when the child was removed. Mother's sporadic, insensitive, and sometimes alarming attempts at visitation with Zeylon left the Juvenile Court with no choice but to implement a no-contact order, particularly after Mother threatened her child's life. The proof showed that Mother's visits with Zeylon were traumatic for the child and that he wanted no contact with Mother.

Moreover, the record clearly shows that Zeylon is thriving in his foster home and that his medical problems have greatly improved in the care of his foster mother. Additionally, Zeylon has established a meaningful relationship with his foster family and has expressed a strong desire to stay with them.

Based on the record, we affirm the finding of the Juvenile Court that clear and convincing evidence shows that termination of Mother's parental rights is in the best interest of the child.

## CONCLUSION

The decision of the trial court is reversed in part and affirmed in part. Costs on appeal are assessed against Appellant D.A.S., and her surety, for which execution may issue if necessary.

_____

HOLLY M. KIRBY, JUDGE